BLUST et al., Appellants and Cross-Appellees,

v.

LAMAR ADVERTISING COMPANY; Lamar Advertising
of Mobile, Inc., Appellee and Cross-Appellant.

[Cite as *Blust v. Lamar Advertising Co.*, 157 Ohio App.3d 787, 2004-Ohio-2433.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 19942.

Decided May 14, 2004.

788

790

John B. Huber and David G. Roach, for appellants.

Robert P. Bartlett and Dina M. Cary; Irene C. Keyse–Walker, for appellee.

FREDERICK N. YOUNG, Judge.

{¶ 1} John and Jean Blust appeal from the trial court's decision and entry ordering a new trial after they rejected remittitur of a punitive damages award they obtained against Lamar Advertising of Mobile, Inc. ("Lamar").[1]  In a cross-

---

1.  Jean Blust is a party to this action in her capacity as executor of the estate of Lillian Blust.

appeal, Lamar appeals from the trial court's decision and entry overruling its motion for judgment notwithstanding the verdict on the issue of punitive damages.

{¶ 2} The Blusts advance four assignments of error. First, they contend that the trial court erred in ordering a new trial on the basis of excessive punitive damages. Second, they assert that the trial court erred in ordering a new trial on all issues rather than limiting the new trial to punitive damages. Third, they argue that the trial court erred in excluding evidence of the financial worth of Lamar's parent corporation, thereby offsetting and rendering harmless any excessiveness in the punitive damages award. Fourth, they claim that the trial court erred in finding the punitive damages award excessive on state-law grounds not argued by Lamar.

{¶ 3} In its cross-appeal, Lamar advances two assignments of error. First, it contends that the trial court erred in overruling its motions for a directed verdict and judgment notwithstanding the verdict on the issue of punitive damages. Second, it claims that the trial court erred in rejecting its argument that the punitive damages award violated its substantive due process rights under the Fourteenth Amendment to the United States Constitution.

{¶ 4} With regard to the Blusts' appeal, we conclude that the trial court did not err in ordering a new trial on the basis of an excessive punitive damages award. Nevertheless, we do believe that the trial court abused its discretion in ordering a retrial of all claims and issues in the case. We find no error, however, in the trial court's exclusion of evidence about the worth of Lamar's parent corporation. Finally, we agree that the trial court erred in finding the punitive damages award excessive on state-law grounds not argued by Lamar. This error was harmless, however, because the award is grossly excessive under the federal constitutional standards argued by Lamar.

{¶ 5} As for Lamar's cross-appeal, we conclude that the trial court did not err in overruling its motions for a directed verdict and judgment notwithstanding the verdict on the issue of punitive damages. We agree, however, that the punitive damages award violated Lamar's substantive due process rights under the Fourteenth Amendment to the United States Constitution. As a result, the judgment of the Montgomery County Common Pleas Court will be affirmed in part and reversed in part, and this cause will be remanded for further proceedings consistent with this opinion.

## I. Factual and Procedural Background

{¶ 6} Lamar leasing agent Melissa Kramer met with an individual named James Weber in September 1998 to discuss placing an advertising billboard on his rural Miami Township property. Weber agreed to the proposal and leased

Lamar a small piece of farmland near the property line between his farm and an abutting farm owned by the Blusts. The two farms were separated by an old wire fence that was largely concealed in dense brush, vines, and trees. Because it planned to erect its billboard near the tree line and the undergrowth separating the two farms, Lamar hired a local company, Woody's Tree Medics, to remove some of the trees and vegetation from Weber's property.

{¶ 7} A Woody's work crew subsequently entered the Blusts' property and cut 34 trees that were growing wild. Of the 34 trees, 17 were more than three inches in diameter. At trial, the parties offered conflicting testimony as to (1) whether Kramer was aware of the fence line or its significance as a boundary marker prior to the cutting, (2) when she discovered that the workers were removing trees owned by the Blusts, (3) whether Kramer ordered the cutting to continue despite knowing that the workers were removing the Blusts' trees, and (4) whether she believed that she had permission to cut trees on the Blusts' side of the property line. After several days of testimony, a jury found Lamar liable in tort for trespassing and removing the trees without permission. The jury awarded compensatory damages of $32,000 and answered "yes" to an interrogatory asking whether the Blusts were entitled to recover punitive damages.

{¶ 8} After hearing additional testimony, the jury awarded the Blusts punitive damages of $2,245,105. The trial court subsequently denied Lamar's motion for judgment notwithstanding the verdict on the punitive damages award but indicated that it would grant a new trial on all issues, including liability, unless the Blusts accepted remittitur of the punitive damages award to $550,316.80, with one-half of that amount going to a nonprofit nature conservancy. The Blusts rejected remittitur, and the trial court ordered a new trial. Thereafter, the Blusts filed this timely appeal, challenging the trial court's determination that the punitive damages verdict was excessive and its decision to grant a new trial on all issues. Lamar responded with a timely cross-appeal, arguing that the punitive damages issue should not have been submitted to the jury and, alternatively, that the jury's punitive damages award was grossly excessive in violation of its federal substantive due process rights.

## II.   Analysis of the Blusts' Appeal

{¶ 9} We begin our analysis with the Blusts' appeal from the trial court's order of a new trial following their rejection of remittitur. In their first assignment of error, the Blusts contend the trial court erred in ordering a new trial on the grounds of "excessive" punitive damages. They insist the trial court could grant a new trial only upon finding that the punitive damages award was either (1) "manifestly" excessive or (2) influenced by passion or prejudice. Because the trial court merely found the punitive damages award to be excessive,

as opposed to "manifestly" excessive, the Blusts contend a new trial was not authorized.

{¶ 10} Upon review, we find the foregoing argument to be unpersuasive. When a verdict is influenced by passion or prejudice, a trial court must order a new trial. *Larrissey v. Norwalk Truck Lines, Inc.* (1951), 155 Ohio St. 207, 218–219, 44 O.O. 238, 98 N.E.2d 419. However, when a verdict is excessive but not influenced by passion or prejudice, a trial court must offer the plaintiff a choice between remittitur or a new trial. If the plaintiff rejects remittitur, a new trial must be ordered. Id.; see, also, *Brady v. Miller*, Montgomery App. No. 19723, 2003-Ohio-4582, 2003 WL 22025969.

{¶ 11} In the present case, the trial court found that the jury's punitive damages verdict was "excessive" but not tainted by passion or prejudice. Therefore, the trial court properly directed the Blusts to choose remittitur or a new trial. Contrary to the Blusts' argument, the trial court was not required to declare the punitive damages verdict "manifestly excessive" in order to grant a new trial after their rejection of remittitur. As we recently recognized in *Brady*, remittitur is appropriate when a damages award is excessive, and a prevailing party's rejection of remittitur compels a trial court to order a new trial. *Brady*, supra, at ¶ 5. While some decisions do indicate that a new trial or remittitur is appropriate when a verdict is "manifestly excessive," the trial court's omission of the word "manifestly" does not constitute reversible error. In any event, as we will explain more fully, infra, in our analysis of Lamar's cross-appeal, the jury's $2,245,105 punitive damages verdict was manifestly excessive, as it constituted a violation of Lamar's substantive due process rights under the Fourteenth Amendment to the United States Constitution. The Blusts' first assignment of error is overruled.

{¶ 12} In their second assignment of error, the Blusts assert that the trial court erred in ordering a new trial on all issues rather than limiting the new trial to punitive damages. In support, the Blusts note that the only issue tainted by error is the amount of the jury's punitive damages award. Thus, they reason that they should not be required to place in jeopardy their compensatory damages award or the jury's determination that some punitive damages are warranted by undergoing a new trial on those issues.

{¶ 13} Upon review, we find the Blusts' argument to be persuasive. After determining that the jury's punitive damages verdict was excessive, the trial court remitted the award to $550,316.80, with one-half of that amount going to a nonprofit nature conservancy. The trial court then required the Blusts to elect between accepting the remittitur or undergoing a new trial on all issues. After

being questioned by the Blusts' counsel about the scope of a new trial, the trial court explained its decision as follows:

{¶ 14} "Well, I—I think in view of the—of the [v]erdict, it is—because the punitive damages issue is so tied into the compensatory issue, I think that the only way to go—how could a [j]ury do punitive damages without knowing all the facts in the case anyway?

{¶ 15} "So, in—in answer to your question, the whole thing would start all again.

{¶ 16} "* * *

{¶ 17} "Basically because of the nature of the law—and this is a long legal type situation, the bottom line to you will be that with the remittitur being rejected, this Court has no alternative but—in my opinion, at least, to—other than to grant a new trial on all the issues."

{¶ 18} Although a trial court is authorized under Civ.R. 59(A) to grant a new trial "on all or part of the issues," we believe the trial court abused its discretion in the present case by ordering the retrial of issues that do not appear to have been tainted by error. The trial court apparently believed that a retrial of all issues was required because the issues of compensatory and punitive damages are related and because a jury would need to rehear much of the evidence. In our view, however, neither rationale justifies ordering the retrial of issues that a jury has resolved in the Blusts' favor without any finding of prejudicial error.

{¶ 19} It is true that compensatory damages are related to punitive damages, at least insofar as compensatory damages are used (along with other criteria) as a yardstick against which to measure a proper punitive damages award. See, e.g., *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003), 538 U.S. 408, 424-426, 123 S.Ct. 1513, 155 L.Ed.2d 585 (reviewing the ratio between compensatory and punitive damages to determine whether the punitive damages award was excessive). It is also true that retrying the issue of punitive damages likely would require presenting much of the case to a new jury. We discern no legitimate reason, however, why either of the foregoing considerations should require the Blusts to place in jeopardy their compensatory damages award or the jury's determination that they are entitled to some punitive damages. The Blusts need not be required to prevail a second time on these issues merely because the first jury awarded excessive punitive damages. See *Woods v. Resident Homes Assn.* (Mar. 17, 1992), Montgomery App. No. CA–12767, 1992 WL 52762 (holding that the trial court abused its discretion in ordering a retrial of all issues to remedy an erroneous damages award).

{¶ 20} In our view, the proper procedure for the Blusts' new trial is set forth in *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 654, 635 N.E.2d 331.

In that case, the Ohio Supreme Court found that a $3 million punitive damages award was excessive. As a result, it ordered the award remitted to $1 million. The *Moskovitz* court then stated: "Upon remand, appellant may elect to accept the remittitur, in which case the trial court shall enter judgment in appellant's favor for $1 million in punitive damages. Conversely, appellant may elect to refuse the remittitur, in which case a new trial should be conducted only on the issue of punitive damages. A jury, if one is impanelled for this purpose, shall be instructed that punitive damages in some amount must be awarded and that the jury's determination is to be based upon the evidence presented to them which, we fully recognize, might require re-presentation of much of the underlying case." (Footnote omitted.) Id. at 653–654, 635 N.E.2d 331; see, also, *Trauth v. Dunbar* (1983), 5 Ohio St.3d 68, 70, 5 OBR 123, 448 N.E.2d 1368 (finding that jury verdicts on issues untainted by error should not be disturbed because "[e]rror as to one issue need not attach to others"). We see no reason why the foregoing procedure could not be used in the present case, and we believe that the trial court abused its discretion by requiring the Blusts to prove entitlement to compensatory and punitive damages a second time without any good reason. Accordingly, we direct the trial court to limit a new trial to the issue of the proper amount of punitive damages, as set forth in *Moskovitz,* supra.

{¶ 21} In opposition to the foregoing conclusion, Lamar contends that the Blusts cannot complain about the scope of the new trial because they consented to it. We disagree. The trial court required the Blusts to choose between accepting remittitur of the punitive damages award and undergoing a new trial on all issues. This was not the correct choice. As set forth above, the proper choice was between remittitur of the punitive damages award and a new trial limited to the amount of punitive damages. Because the Blusts were not given the option of choosing a new trial limited to the amount of punitive damages, we cannot agree that they waived any objection to the new trial order.

{¶ 22} We also reject Lamar's reliance on *Wilhelm v. Barnes* (Aug. 11, 1982), Knox App. No. 82–CA–03, 1982 WL 11275, to support granting a new trial on all issues. In *Wilhelm,* a jury found that one of the defendants had caused harm to the plaintiffs' residential property and awarded compensatory and punitive damages. The trial court later determined that the compensatory and punitive damages awards were excessive and were given under the influence of passion or prejudice. As a result, the trial court ordered a new trial as to the one defendant who had been found liable. The new trial order was directed toward the amount of damages. Although the *Wilhelm* opinion is unclear, the new trial order also may have been directed toward the issue of the one defendant's liability for any compensatory and punitive damages, as opposed to just the amount of the awards. Upon review, the Fifth District affirmed the trial court's ruling.

{¶ 23} Even if the new trial order in *Wilhelm* did encompass all issues of liability and damages, however, it is distinguishable from the present case in one significant way. The trial court in *Wilhelm* found the jury's damages awards to be excessive and given under the influence of passion or prejudice. When passion or prejudice infects a jury's award of damages, a trial court reasonably may infer that the same passion or prejudice likely tainted the finding of liability as well. See, e.g., *Mueller v. Hubbard Milling Co.* (C.A.8, 1978), 573 F.2d 1029, 1040 (reasoning that excessive damages on one claim due to passion or prejudice "may well have influenced the jury on the liability" issues on another claim). Thus, as we observed in *Scott v. Hall* (Sept. 9, 1988), Montgomery App. No. 10921, 1988 WL 93668, "[i]f any passion and prejudice exist[s], the entire verdict must be vacated and a new trial must be ordered." Conversely, as we recognized in *Woods*, when there is no indication that a verdict is the result of passion or prejudice, a trial court abuses its discretion in ordering a retrial of all issues to remedy an erroneous damages award. See *Woods*, supra, at * 5 ("Significantly, the trial court did not purport to find, nor would there appear to be any basis in the record to support a finding, that the jury's verdict was the result of passion or prejudice. The trial court simply found that the award of damages was contaminated by the trial court's legal error * * *. There is no reason to suppose that this error would have affected the jury's decision on the issue of liability"). In the present case, the trial court found that the jury's verdict was not the result of passion or prejudice. Lamar has not appealed that finding. Thus, we have no reason to infer that the jury's excessive punitive damages award is indicative of any error in its compensatory damages award or its finding of liability for punitive damages. As a result, *Wilhelm* is distinguishable and a retrial on all issues is unnecessary.

{¶ 24} Finally, Lamar argues that an appellate court has the power to order retrial only of issues tainted by prejudicial error, whereas a trial court enjoys broad discretion in determining the scope of a retrial. Be that as it may, we believe the trial court abused its discretion in needlessly ordering the retrial of issues that have been decided by a jury and upon which final judgment has been entered without any apparent prejudicial error. Accordingly, we sustain the Blusts' second assignment of error.

{¶ 25} In their third assignment of error, the Blusts contend that the trial court erred in excluding evidence of the financial worth of Lamar's parent corporation, thereby offsetting and rendering harmless any excessiveness in the jury's punitive damages award. In support, the Blusts contend that the jury's $2.245 million punitive damages award is not excessive when viewed in relation to the substantial worth of Lamar's parent corporation, Lamar Advertising Company. The Blusts note, however, that the trial court excluded evidence about the

worth of Lamar Advertising Company, limiting them to introducing evidence about the financial condition of subsidiary Lamar Advertising of Mobile, Inc., the appellee and cross-appellant in this case. According to the Blusts, the exclusion of evidence about the parent corporation's financial status was erroneous, and it offset any excessiveness in the jury's punitive damages award. Thus, the Blusts argue that any excess in the punitive damages award is harmless error in light of the trial court's improper exclusion of evidence about the value of Lamar's parent corporation.

{¶ 26} Upon review, we are unpersuaded by the Blusts' argument for at least two reasons. First, as explained more fully in our analysis of Lamar's cross-appeal, we believe the jury's $2.245 million punitive damages award is grossly excessive under federal constitutional standards. This is true even if it is viewed in relation to the financial worth of Lamar's parent corporation. Second, the only specific piece of evidence cited by the Blusts pertaining to the value of Lamar's parent corporation is a "10–K report" to the United States Securities and Exchange Commission. Lamar objected to the introduction of this evidence on the basis that it was not identified or produced by counsel for the Blusts until the morning of the punitive damages phase of trial. The trial court sustained this objection. On appeal, the Blusts argue, without citation to evidence, that Lamar had thwarted their efforts to discover the 10–K report earlier. In excluding the evidence, however, the trial court accepted Lamar's argument that the Blusts could have obtained the document from the S.E.C. long before trial. Having reviewed the trial court's ruling on this issue, we find no abuse of discretion. Accordingly, we overrule the Blusts' third assignment of error.[2]

{¶ 27} In their fourth assignment of error, the Blusts contend that the trial court erred in finding the punitive damages award excessive on state-law grounds not argued by Lamar. In support, the Blusts insist that Lamar never moved for remittitur or a new trial based on the excessiveness of the punitive damages award under Ohio common law. According to the Blusts, Lamar sought relief solely on the basis that the jury's $2.245 million punitive damages award violated its substantive due process rights under the Fourteenth Amendment to

2. We note that some of the Blusts' argument under their third assignment of error concerns their belief that Lamar's parent corporation should have been held liable for punitive damages. As Lamar properly notes, however, the Blusts failed to assign as error the trial court's dismissal of the parent corporation. Rather, the assigned error is that "[t]he trial court erred in excluding evidence of the parent's financial worth, thereby rendering any excessiveness in the punitive damages award harmless error and non-prejudicial to the Defendants in the face of that offsetting error." For the reasons set forth above, we conclude that the trial court did not err in excluding evidence of the parent's financial worth and, in any event, that the presentation of such evidence would not have cured the excessiveness in the punitive damages award.

the United States Constitution. Given that the trial court rejected Lamar's constitutional argument, the Blusts contend that it should have upheld the award rather than sua sponte finding the award excessive under Ohio law and ordering remittitur or a new trial.

{¶ 28} Having reviewed the record, we agree that Lamar never sought remittitur or a new trial based on the punitive damages award violating Ohio common law. Lamar filed a motion for judgment notwithstanding the verdict, a new trial, and remittitur on September 26, 2002. With regard to the size of the punitive damages award, Lamar relied primarily on *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, and argued only that the award was clearly excessive in violation of the Due Process Clause of the United States Constitution. Lamar filed another memorandum on November 27, 2002, again relying solely on federal substantive due process to challenge the size of the punitive damages award. Thus, the trial court erred in its May 2, 2003 ruling when it stated that Lamar's new trial and remittitur motions presented "two related, yet distinct issues regarding the jury's award of punitive damages: (1) whether the punitive damages award was grossly excessive and, as such, violated the federal Due Process Clause; and (2) whether the punitive damages award was excessive under Ohio common law." In reality, Lamar's motions presented only the former issue. Therefore, we agree with the Blusts that the trial court erred in finding the punitive damages award excessive under Ohio common law after rejecting Lamar's federal constitutional argument.

{¶ 29} As we will explain in our analysis of Lamar's second assignment of error on cross-appeal, however, the trial court's error was harmless because the punitive damages award was grossly excessive under the federal constitutional standards argued by Lamar. Although the trial court should not have ordered remittitur or a new trial based on Ohio common law, such relief was required because the award violated Lamar's substantive due process rights. Accordingly, we will overrule the Blusts' fourth assignment of error, which asserts that the trial court should not have ordered remittitur or a new trial. As we will explain more fully, infra, the trial court ordered the appropriate relief. It simply did so for the wrong reason by grounding its decision in state law rather than federal substantive due process.

### III. Analysis of Lamar's Cross–Appeal

{¶ 30} Having resolved the assignments of error presented by the Blusts, we turn now to Lamar's cross-appeal. In its first cross-assignment of error, Lamar contends that the trial court erred in overruling its motions for a directed verdict and judgment notwithstanding the verdict on the issue of its liability for punitive

damages. In support, Lamar claims the record lacks the requisite clear and convincing evidence to support a finding that it acted with "actual malice."

{¶ 31} Upon review, we find Lamar's first cross-assignment of error to be unpersuasive. "The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions." *Posin v. A.B.C. Motor Court Hotel, Inc.* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 344 N.E.2d 334. " 'A motion for directed verdict or a motion for judgment notwithstanding the verdict does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence.' " *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68, 23 O.O.3d 115, 430 N.E.2d 935, quoting *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, paragraph three of the syllabus. Because the issue is one of law, appellate review of a trial court's ruling is de novo. *Natl. City Bank v. Rhoades,* 150 Ohio App.3d 75, 2002-Ohio-6083, 779 N.E.2d 799, ¶ 53.

{¶ 32} In order to recover punitive damages, the Blusts were required to show that Lamar acted with "actual malice." The Ohio Supreme Court has defined actual malice as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty* (1987), 32 Ohio St.3d 334, 336, 512 N.E.2d 1174. At trial, the Blusts did not argue that Lamar had their trees removed out of hatred, ill will, or a spirit of revenge, and we find no evidence to support such a claim. Rather, the Blusts asserted that Lamar's act of directing their trees to be cut constituted a conscious disregard for their rights that had a great probability of causing substantial harm. When a plaintiff proceeds on this theory, "before submitting the issue of punitive damages to the jury, a trial court must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a great probability of causing substantial harm. Furthermore, the court must determine that sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety." *Preston,* supra, 32 Ohio St.3d at 336, 512 N.E.2d 1174.

{¶ 33} Viewing the record in a light most favorable to the Blusts, we find substantial evidence from which reasonable minds could conclude that Lamar employee Melissa Kramer consciously disregarded the Blusts property rights by ordering the cutting of trees on their property. Jim Weber, the landowner who entered into the billboard contract with Lamar, informed Kramer of the approximate location of the property line prior to any cutting and instructed her to follow a farm fence as a guide. After the cutting began, an "Amish-appearing man" arrived at the site and informed the workers that they were cutting trees on the wrong property and that they did not have permission to do so. In addition, the Blusts' tenant farmer, Ted Eby, observed a worker clearing trees from the Blusts' side of the property line. He reported the cutting to John Blust, who stated that he had not given anyone permission to cut his trees. Eby then spoke with a member of the work crew and told him that he was cutting trees on the wrong property. Following that conversation, Eby spoke with Melissa Kramer by telephone. He identified himself as a renter of the ground, which was owned by Mr. Blust. He also conveyed John Blust's message that nobody had permission to remove trees from the Blusts' property. Despite these warnings, the workers were instructed by Kramer to continue removing the trees. Thus, as the trial court observed, a reasonable juror could find that Lamar consciously disregarded the Blusts' property rights.

{¶ 34} A closer question is whether Melissa Kramer was aware that her act of having the Blusts' trees cut had a great probability of causing substantial harm.[3] We harbor no doubt that clearing the trees had a great probability of causing *some* harm. Indeed, removing the trees was absolutely certain to cause harm to the extent that the Blusts lost their trees. The crucial issue on appeal is whether Kramer knew that this loss of the trees had a great probability of resulting in substantial harm to the Blusts, or more specifically, whether reasonable minds could differ on this issue. The trial court informed the jury, in accordance with standard Ohio jury instructions, that the term "substantial" means "major, or real importance, of great significance, not trifling or small."

{¶ 35} As noted above, the "harm" in the present case is obvious. It is the loss of the Blusts' trees. In order to determine whether this harm was "substantial," it is necessary to assign some measure of value to the trees. In the course of proceedings below, the Blusts advanced several arguments concerning the value of the trees to support a finding of substantial harm. They asserted that

---

3. In their surreply brief, the Blusts argue that waiver and estoppel preclude Lamar from disputing Kramer's awareness of a great probability of substantial harm. In support, they argue that Lamar failed to raise this issue when seeking a directed verdict in the trial court. We disagree. The record reveals that Lamar specifically asserted the lack of a great probability of substantial harm in support of its motion for a directed verdict.

someday they may wish to divide a portion of their farmland into residential plots and that the absence of the trees would harm the value of the plots. Under this scenario, the Blusts' expert testified that removal of the trees would diminish the fair market value of the property by $51,600 if a portion of it was used for residential purposes. The Blusts also argued that John Blust had a personal interest in three or four walnut trees that had been growing wild in the tree line. Mr. Blust testified that he had hoped someday to harvest the walnut trees for their veneer value. The record contains no evidence, however, what that value may be. The Blusts also presented evidence about the cost to replace the wild trees that had been cut by the work crew. In particular, the Blusts presented testimony that it would cost $40,566.33 to purchase and replant all of the trees or $24,335 to replant 11 of the larger trees. For its part, Lamar presented evidence that the "stump" or firewood value of the timber was $105. Lamar also presented expert testimony that removal of the trees had a "practically imperceptible" effect on the fair market value of the Blusts' property. When questioned further, however, Lamar's expert indicated that removal of the trees may have caused the Blusts' property value to decline by at most one percent, or $3,870.

{¶ 36} After reviewing the foregoing possible measures of the harm to the Blusts, we find that most of them at least arguably could be characterized as "substantial."[4] As noted above, however, Melissa Kramer must have been aware that cutting the Blusts' trees had a great probability of causing one or more of these substantial harms. With regard to the alleged loss of property value if the Blusts ever subdivide their farm for residential purposes, the record is devoid of evidence that Kramer was aware of any such intent. The record also contains nothing to indicate that Kramer knew, prior to the removal of the trees, of John Blust's hope one day to sell the walnut trees for their veneer value. Thus, no reasonable trier of fact could find that she knew her actions had a great probability of causing harm to the future residential value of the land or to Mr. Blust's future prospects of marketing veneer.

{¶ 37} Likewise, with regard to the cost of replanting the trees, no reasonable trier of fact could find that Melissa Kramer was aware that cutting the Blusts' trees had a great probability of resulting in harm valued at $40,566.33 to purchase and replant all of the trees or even $24,335 to replant 11 of the larger trees. We reach this conclusion for two reasons. First, photographs reveal that the felled trees comprised a small part of a tree line dividing two farms. Given the location of the trees, which were growing wild near a rural road, Kramer could not have anticipated a great probability of the Blusts', who did not even

---

4. The one exception is the "stump" or firewood value of the cut trees. The $105 value is relatively insignificant, and we note that the Blusts retained the cut trees.

reside on the property, desiring to replant the trees. Second, replacement cost is not the typical measure of the harm when wild trees are cut. When a party trespasses and cuts trees that are part of a woodland mix and not unique, the ordinary measure of the harm is the difference in the fair market value before and after the cutting. See, e.g., *Kapcsos v. Hammond* (1983), 13 Ohio App.3d 140, 141, 13 OBR 173, 468 N.E.2d 325. Therefore, despite the jury's compensatory damage award of $32,000, Kramer could not reasonably be found to have disregarded a great probability of causing harm of this magnitude.

{¶ 38} With regard to the fair market value issue, however, we believe reasonable minds can differ as to whether Kramer was aware that her actions had a great probability of causing "substantial harm." In reaching this conclusion, we first note that Lamar's own expert testified that removal of the trees may have reduced the Blusts' property value by as much as $3,870. A reasonable juror could find that a loss of this size qualifies as substantial harm and not a trivial loss. Furthermore, we note that this measure of the harm does not depend on anything that may have been unknown or unforeseeable to Kramer, such as aspirations for future residential development, John Blust's fondness for walnut trees, or even a desire to replant unkept, wild trees. Rather, a decline in the value of one's property as a result of losing trees is the typical measure of the harm, and it is entirely predictable. Although the issue is perhaps a close one, we believe reasonable minds could differ as to whether Kramer was aware her actions had a great probability of causing substantial harm, namely the loss of property value attributable to the removal of the Blusts' trees. In reaching this conclusion, we do not completely discount the fact that a unanimous jury valued the harm in this case at $32,000. Even if Kramer could not anticipate that her actions would result in compensatory damages of that magnitude, a trier of fact could find that she consciously disregarded a great probability of causing fair-market-value harm of $3,870, which is far more than trifling. As a result, we overrule Lamar's first assignment of error.

{¶ 39} In its second cross-assignment of error, Lamar contends the trial court erred in rejecting its argument that the punitive damages award violated its federal substantive due process rights. In support, Lamar argues that the jury's $2.245 million award was grossly excessive under the standards set forth in *State Farm v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585, which was decided before the trial court's ruling but not cited in its May 2, 2003 opinion. Lamar advances this argument as an alternative basis to affirm the trial court's order of a new trial following the Blusts' rejection of remittitur.[5]

---

5. As noted supra, the trial court erroneously found the punitive damages award excessive on state-law grounds not advanced by Lamar. Thus, we must consider Lamar's substantive due

■ {¶ 40} Upon review, we agree that the jury's punitive damages award violates Lamar's substantive due process rights. In *Campbell,* the United States Supreme Court revisited the three guideposts it previously had set forth in *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, for determining when a punitive damages award is unconstitutionally excessive. Those guideposts are "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Campbell,* supra, 538 U.S. at 418, 123 S.Ct. 1513, 155 L.Ed.2d 585.

■ {¶ 41} The *Campbell* court reiterated that the " 'most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.' " Id., 538 U.S. at 419, 123 S.Ct. 1513, 155 L.Ed.2d 585, quoting *Gore,* supra, 517 U.S. at 575, 116 S.Ct. 1589, 134 L.Ed.2d 809. Courts are to assess the reprehensibility of a defendant's conduct by considering five factors: (1) whether "the harm caused was physical as opposed to economic"; (2) whether "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others"; (3) whether "the target of the conduct had financial vulnerability"; (4) whether "the conduct involved repeated actions or was an isolated incident"; and (5) whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident." Id. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." Id.

{¶ 42} Application of the foregoing "reprehensibility" factor militates against the jury's $2.245 million punitive damages award. Indeed, the first four factors weigh in favor of Lamar. First, the harm to the Blusts was economic, not physical. Second, Lamar's conduct did not endanger the health or safety of anyone. Third, the record is devoid of evidence that the Blusts are financially vulnerable. Fourth, nothing in the record establishes that Lamar's misconduct was anything other than an isolated incident. The fifth factor weighs in favor of the Blusts, however, because a trier of fact reasonably could find that Lamar's misconduct was the result of intentional malice as opposed to mistake. Although *Campbell* cautions that the existence of only one of the foregoing factors "may not be sufficient to sustain a punitive damages award," we cannot say that no punitive damages were warranted in the present case. Id., 538 U.S. at 419, 123

---

process argument, which the trial court rejected, as an alternative basis to uphold the new-trial order.

S.Ct. 1513, 155 L.Ed.2d 585. We do believe, however, that the "reprehensibility" guidepost militates strongly against the constitutionality of the jury's $2.245 million punitive damages award.

{¶ 43} The second guidepost also renders the jury's punitive damages award constitutionally suspect. Although the *Campbell* court declined to impose a bright-line ratio between compensatory and punitive damages, it observed that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Id., 538 U.S. at 425, 123 S.Ct. 1513, 155 L.Ed.2d 585. The court noted, however, that "where 'a particularly egregious act has resulted in only a small amount of economic damages,'" larger ratios may comport with due process. Id., quoting *Gore*, 517 U.S. at 582, 116 S.Ct. 1589, 134 L.Ed.2d 809. On the other hand, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Id.

{¶ 44} In the present case, our analysis of the five "reprehensibility" factors demonstrated that Lamar's conduct, while not admirable, was not exceptionally egregious, insofar as only one of the factors favored the Blusts. Given the nature of the loss in this case, we also believe that the jury's $32,000 compensatory damages award was substantial. As a result, we harbor no doubt that the jury's punitive damages award—which exceeded the $32,000 compensatory damages by a ratio of approximately 70 to 1—was unreasonable and disproportionate to the harm caused.

{¶ 45} Finally, the third guidepost suggests that the jury's punitive damages award violated Lamar's substantive due process rights. The third guidepost is "the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'" Id. 538 U.S. at 418, 123 S.Ct. 1513, 155 L.Ed.2d 585, quoting *Gore*, supra, 517 U.S. at 575, 116 S.Ct. 1589, 134 L.Ed.2d 809. The most relevant civil sanction is found in R.C. 901.51, which authorizes the recovery of treble damages for the reckless destruction of brush or trees. In the present case, the Blusts asserted a claim under R.C. 901.51 but elected to forego it and to seek punitive damages for the malicious destruction of their trees. If the Blusts had proceeded under the statute, however, they would have received treble damages of $96,000. The jury's verdict of $2.245 million in punitive damages dwarfs this roughly analogous statutory penalty, even taking into account the fact that punitive damages require a higher level of misconduct.

{¶ 46} Having reviewed each of the *Gore* guideposts, we conclude that the jury's punitive damages award was neither reasonable nor proportionate to the wrong committed. In the language of *Campbell*, it was "an irrational and arbitrary deprivation of the property" of Lamar in violation of the Due Process

Clause of the Fourteenth Amendment. Id., 538 U.S. at 429, 123 S.Ct. 1513, 155 L.Ed.2d 585. Accordingly, we sustain Lamar's second cross-assignment of error and affirm the trial court's order of a new trial on this alternative basis.

### IV. Conclusion

{¶ 47} Based on the reasoning set forth above, the judgment of the Montgomery County Common Pleas Court is affirmed in part and reversed in part, and this cause is remanded for further proceedings consistent with this opinion.

Judgment accordingly.

GRADY, J., concurs.

BROGAN, J., dissents.

BROGAN, Judge, dissenting.

{¶ 48} I respectfully dissent from the majority's holding that the trial court properly submitted the punitive damages issue to the jury. In my view, the trial court erred in overruling Lamar's motions for a directed verdict and judgment notwithstanding the verdict on that issue.

{¶ 49} Before submitting the punitive damages issue to the jury, the trial court was required to find that reasonable minds could differ as to (1) whether Lamar employee Melissa Kramer consciously disregarded the Blusts' rights and (2) whether Kramer was aware that her acts had a great probability of causing substantial harm. *Preston v. Murty* (1987), 32 Ohio St.3d 334, 336, 512 N.E.2d 1174. The evidence in the present case supports a finding that Kramer acted without the Blusts' permission and ordered the removal of trees that she knew were on the Blusts' property. Therefore, a trier of fact reasonably could find that she consciously disregarded the Blusts' property rights.

{¶ 50} My disagreement with the majority concerns the second requirement. Although I do not condone Lamar's destruction of the Blusts' trees, the record does not contain evidence from which a juror reasonably could find that Kramer was aware her acts had a *great* probability of causing *substantial* harm. Kramer ordered the clearing of a small area of scrub brush and trees along a rural road. All of the trees were growing wild in a fence line that separated the Blusts' 75.8–acre farm from another large field. Just seventeen of the trees were of any significant size, and even John Blust really only cared about three or four walnut trees in that grove.

{¶ 51} Viewing the evidence in a light most favorable to the Blusts, I do not believe reasonable minds could find that Kramer knew removing the trees had a great probability of causing substantial harm. Kramer knew nothing of any plan to subdivide the farmland for residential purposes and to use the tree line as a

screen, even assuming for present purposes that such a plan existed. Until after the cutting, she also knew nothing about the presence of the walnut trees, or of John Blust's future aspirations to harvest the wood for its unspecified veneer value. Likewise, Kramer could not have anticipated the Blusts' desiring to replant the wild trees on the edge of their farmland. The volunteer trees served no apparent purpose and had no apparent value. In this regard, Lamar presented uncontroverted testimony that trees on the edge of a farm field *typically are removed* because their branches interfere with crop yields by causing shade, and their roots interfere with plant growth and cultivation. Finally, the record does not support a finding that Kramer knew removing the trees likely would have a negative impact on the Blusts' property value. After reviewing pictures of the scene, I do not believe that a reasonable juror could find any real value in the trees, other than their "stump" value of $105.

{¶ 52} In short, a review of the record reveals no reason for Kramer to suspect that substantial harm would befall the Blusts, neither of whom even resides on the land, if a small portion of the tree line was removed. Because reasonable minds could not differ as to whether Kramer was aware that her conduct had a great probability of causing substantial harm, I believe the trial court erred in overruling Lamar's motions for a directed verdict and judgment notwithstanding the verdict. As a result, I would sustain Lamar's first assignment of error on cross-appeal and overrule all other assignments of error as moot.