[Cite as *Innovative Technologies Corp. v. Advanced Mgt. Technology, Inc.*, 2011-Ohio-5544.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

INNOVATIVE TECHNOLOGIES          :
CORPORATION

    Plaintiff-Appellee/          :          C.A. CASE NO.     23819
    Cross-Appellant

v.                               :          T.C. NO.    2003CV3674

ADVANCED MANAGEMENT             :          (Civil appeal from
TECHNOLOGY, INC.                              Common Pleas Court)
                                 :
    Defendant-Appellant/
    Cross-Appellee               :

                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the   28th   day of   October  , 2011.

. . . . . . . . . .

JAMES A. DYER, Atty. Reg. No. 0006824 and MICHAEL P. MOLONEY, Atty. Reg. No. 0014668 and HEATHER DUFFEY WELBAUM, Atty. Reg. No. 0071019 and CATHARINE D. KIDD, Atty. Reg. No. 0085427, 1900 Kettering Tower, 40 N. Main Street, Dayton, Ohio 45423

    Attorneys for Plaintiff-Appellee/Cross-Appellant Innovative Technologies Corporation

BRAD S. SULLIVAN, Atty. Reg. No. 0040219, Chemed Center, Suite 1900, 255 East Fifth Street, Cincinnati, Ohio 45202

and

DAVID C. GREER, Atty. Reg. No. 0009090, 400 National City Center, 6 N. Main Street, Dayton, Ohio 45402

    Attorneys for Defendant-Appellant/Cross-Appellee Advanced Management Technology, Inc.

. . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant/cross-appellee Advanced Management Technology, Inc. (hereinafter "AMTI") appeal multiple judgments of the Montgomery County Court of Common Pleas, General Division, overruling two motions for summary judgment, a motion for judgment notwithstanding the verdict ("JNOV"), and a motion for a new trial rendered in the civil suit brought against them by plaintiff-appellee/cross-appellant Innovative Technologies Corporation (hereinafter "ITC"). AMTI also appeals the trial court's decision that conditionally granted its motion for remittitur of both the compensatory and punitive damages awarded by the jury. Lastly, AMTI appeals the trial court's decision granting attorney's fees to ITC.

{¶ 2} In its cross-appeal, ITC argues that the trial court erred when it conditionally granted AMTI's motion for remittitur which reduced the compensatory damages award from $5,752,894.00 to $1,970,599.44, and the punitive damages award from $17,000,000.00 to $5,832,974.34.

{¶ 3} AMTI filed a timely notice of appeal with this Court on January 5, 2010. ITC filed a timely notice of cross-appeal on January 15, 2010.

I

{¶ 4} Plaintiff-appellee/ cross-appellant ITC is an Ohio-based government contractor that provides onsite administrative, operational, and consulting services primarily for the Department of the Air Force located at Wright Patterson Air Force Base (hereinafter "WPAFB"). From May of 1995 until August 31, 2001, ITC was

under contract to provide support services to the Mobility Systems Program Office (hereinafter "Mobility SPO") at WPAFB.   The Mobility SPO contract required ITC to provide twenty-two civilian employees to work at WPAFB.   The Mobility SPO contract was initially scheduled to be renewed in May of 2001.

{¶ 5} Defendants James Silcott, Sheila Silcott, and David Nicholas (hereinafter collectively referred to as "the individual defendants") were employees of ITC assigned to work on the Mobility SPO contract at WPAFB.   James Silcott was ITC's on-site task manager for the Mobility SPO, and was described as ITC's "eyes and ears" for the project at WPAFB.

{¶ 6} At the beginning of their employment, the individual defendants were required by ITC to sign two documents, "An Agreement Covering Confidentiality, Conflict of Interest, Noncompetition, Proprietary Rights, and Related Matters," and a "Full-Time At-Will Employment Agreement."   Viewed together, the agreements required employees to maintain the confidentiality ITC's trade secrets and proprietary information and relinquish said information upon termination of their employment.   The agreements also restricted employees of ITC  from soliciting business from ITC's current client base or any potential clients who were being actively courted for business purposes for a period of six months after termination. The agreements prohibited employees from engaging in business activities which competed with ITC, as well as requiring the written consent of ITC in order to hire away any ITC employees.   Lastly, the agreements prohibited employees from accepting employment from another contractor competing for work currently being performed by the employee for ITC.

**{¶ 7}** The individual defendants formed defendant business entity Kenton Trace Technologies, L.L.C. (hereinafter "KTT") on April 3, 2000, while they were still employed by ITC. Since KTT had no work history and no employees other than the three individual defendants, the newly formed company was ineligible to enter a bid for the Mobility SPO contract. In order to gain the necessary credentials, James Silcott secretly approached representatives from defendant-appellant/cross-appellee AMTI, a large, publicly held, government contracting firm based in Washington, D.C. AMTI immediately expressed interest in Silcott's proposal as it had been attempting, albeit unsuccessfully, to win government contracts at WPAFB.

**{¶ 8}** In September of 2000, KTT and AMTI entered into a "teaming agreement" in order to submit a bid against ITC for the Mobility SPO contract. James Silcott promised that he could persuade the incumbent employees currently working for ITC to leave and come work for KTT. In return, AMTI promised that it would employ KTT as its subcontractor once it received the Mobility SPO contract. Both AMTI and KTT believed their plan would be successful because the Air Force would be able to retain the incumbent work force for the Mobility SPO contract. KTT and AMTI utilized ITC's proprietary salary information and incumbent employee information in order to prepare a bid for the contract.

**{¶ 9}** On January 30, 2001, KTT was granted a General Services Administration (hereinafter "GSA") schedule which permitted it to bid on various government contracts at WPAFB, including the Mobility SPO contract held by ITC. In March of 2001, AMTI helped KTT acquire the necessary security clearance for

employment at WPAFB. On April 26, 2001, Silcott informed AMTI that KTT intended to submit a bid for the Mobility SPO contract and that KTT looked forward to working with AMTI in the future. On May 3, 2001, the individual defendants resigned from their employment at ITC. On May 4, 2001, the GSA formally announced that ITC, KTT, AMTI, and H.J. Ford would receive a Request for Proposal (hereinafter "RFP") for the renewal of the Mobility SPO contract. An RFP is a mechanism which provides a contractor with permission to submit a bid on a government contract set for renewal. Although AMTI and H.J. Ford received RFPs for the Mobility SPO contract, both companies abstained from bidding and did not submit proposals. As part of its bid proposal, KTT attached employee resume authorization forms from several ITC employees who were already working for ITC on the Mobility SPO contract.

{¶ 10} Upon becoming aware of the actions taken by KTT, ITC filed a complaint (2001 CV 2521) against KTT, as well as a motion for a temporary restraining order and preliminary injunction in order to enjoin KTT from competing for the Mobility SPO contract. Following hearings held on May 30, 2001, and June 4, 2001, the trial court issued a written decision on June 21, 2001, in which it held that ITC's employment agreements signed by the individual defendants were enforceable and that the Silcotts and Nicholas had breached them. Specifically, the trial court held that the individual defendants, while employed by ITC and for six months after their employment had been terminated, could not compete with ITC for a service that ITC was providing or had a contract to provide. Additionally, the court held that once ITC's Mobility SPO contract with WPAFB expired, the

employment agreements no longer operated to prevent the individual defendants or other incumbent employees from going to work for a new contractor while performing the same job. Thus, KTT was denied permission to bid on the Mobility SPO contract, and ITC received an extension on its contract with the Air Force until August 31, 2001.

{¶ 11} In light of the events surrounding the May 2001 bid, officials at WPAFB decided to issue a second RFP in August of 2001. Since KTT was enjoined from submitting a bid for the August 2001 RFP, AMTI again offered to hire the company as a subcontractor if KTT promised to provide the incumbent employees from ITC, and KTT agreed. AMTI met with the ITC incumbent employees and obtained their pledge to work for the KTT/AMTI team as early as July of 2001. In August of 2001 AMTI, along with four other contractors (including ITC), submitted bids for the Mobility SPO contract. Testimony adduced at the trial established that AMTI utilized privileged and confidential proprietary information provided by the individual defendants, as well as other incumbent employees from ITC, in formulating its proposal for the Mobility SPO contract.

{¶ 12} AMTI submitted its bid to WPAFB on August 22, 2001. On August 29, 2001, the Air Force awarded the Mobility SPO contract to AMTI. Along with the three individual defendants, nineteen former employees of ITC went to work for AMTI after it won the Mobility SPO contract. Ultimately, AMTI was awarded the Mobility SPO contract for three additional option years, maintaining it until May of 2005. During the entire four-year period in which it held the Mobility SPO contract, AMTI utilized substantially the same group of incumbent employees who had

previously worked for ITC.

{¶ 13} On April 30, 2003, ITC filed a notice of dismissal without prejudice pursuant to Civ. R. 41(A) in Case No. 2001 CV 2521. Less than a month later, ITC re-filed its complaint against KTT, the Silcotts and Nicholas, as well as adding AMTI as a defendant in the litigation after learning of the defendants' conspiracy. On June 22, 2004, ITC filed a motion for partial summary judgment. KTT and the individual defendants filed a joint motion to dismiss and motion in opposition to ITC's motion for partial summary judgment on July 26, 2004. On February 15, 2005, the trial court issued a decision overruling KTT's joint motion to dismiss. In the same decision, the trial court overruled in part and sustained in part ITC's motion for partial summary judgment. Specifically, the court held that as a matter of law, the individual defendants violated their employment agreements with ITC and were faithless servants. The trial court also held that it could not determine, as a matter of law, whether KTT misappropriated trade secrets from ITC because genuine issues existed regarding whether the information which ITC sought to protect constituted trade secrets under Ohio law. Lastly, the court held that genuine issues existed regarding ITC's claim for tortious interference against all of the defendants.

{¶ 14} On November 4, 2005, ITC filed an amended complaint against AMTI, KTT, and the individual defendants in which it made the following claims: Count I, breach of contract and enforcement of restrictive covenants against the individual defendants; Count II, misappropriation of trade secrets against all defendants; Count III, disgorgement of compensation by faithless servants against the individual

defendants; Count IV, breach of contract for award of attorney's fees against the individual defendants; Count V, tortious interference with contracts and business relationships against all defendants; Count VI, tortious interference with prospective economic advantage against all defendants; Count VII, breach of fiduciary duty against the individual defendants; Count VIII, civil conspiracy against AMTI; and Count IX, unjust enrichment against AMTI.

{¶ 15} ITC filed a motion for partial summary judgment on its claims for misappropriation and tortious interference with contracts against AMTI on April 4, 2006. AMTI filed a motion for summary judgment against ITC on the same day. In its motion, AMTI argued that ITC cannot prove as a matter of law that AMTI proximately caused ITC to lose the Mobility SPO contract. In a decision filed on July 13, 2006, the trial court overruled both parties' motions.

{¶ 16} On November 22, 2006, AMTI filed a motion for partial summary judgment in which it again argued that ITC could not prove that the actions taken by AMTI proximately caused ITC to lose the Mobility SPO contract. The trial court overruled AMTI's motion in a written decision filed on March 5, 2007. The court found that genuine issues of material fact existed regarding whether ITC would have retained the Mobility SPO contract "but for" the actions of AMTI.

{¶ 17} We note that shortly before the trial began in December of 2007, the trial court issued a decision which limited ITC to introducing evidence of lost profits from only the base year of the Mobility SPO contract. Thus, ITC was barred from introducing evidence of lost profits from any of the three subsequent option years since the trial court found such evidence to be speculative insofar as the Air Force

had the sole discretion to either renew or decline to renew the Mobility SPO contract with the winning bidder after the base year expired. We also note that the compensatory damages portion of the trial was bifurcated from the punitive damages portion.

{¶ 18} The compensatory damages portion of the jury trial began on December 10, 2007. AMTI moved for a directed verdict both at the close of ITC's case, as well as at the close of all of the evidence. The trial court overruled both motions for directed verdict. After a ten-day trial, the jury rendered a verdict finding AMTI, KTT, and the individual defendants liable for ITC's damages. The jury subsequently awarded ITC $752,894.00 against AMTI for misappropriation of trade secrets; $4,000,000.00 against AMTI for tortious interference with ITC's contracts with its employees; and $1,000,000.00 against AMTI for civil conspiracy for an aggregate total of $5,752,894.00 in compensatory damages against AMTI. KTT was found liable for $471,744.00 for misappropriation of trade secrets against ITC. With respect to the individual defendants, the jury awarded ITC the wages and benefits it had paid them while they were illegally conspiring with AMTI, to wit: $128,161.40 to James Silcott; $32,928.66 to Sheila Silcott; and $90,127.38 to David Nicholas. AMTI moved for judgment notwithstanding the verdict on December 31, 2007, prior to the beginning of ITC's case on punitive damages. The trial court overruled AMTI's motion for JNOV on January 3, 2008. After the punitive damages portion of the trial, AMTI was found liable for $17,000,000.00 in punitive damages. The jury also found AMTI liable for ITC's attorney's fees in this litigation.

{¶ 19} On February 4, 2008, AMTI filed a motion for JNOV, a motion for a new trial, and an alternative motion for vacatur or remittitur of the compensatory and punitive damages awards. In a thorough decision filed on July 10, 2008, the trial court overruled AMTI's motion for JNOV and motion for new trial. However, the trial court granted AMTI's motion for remittitur as to both the compensatory and punitive damages awarded by the jury, which reduced the compensatory damages award from $5,752,894.00 to $1,970,599.44, and the punitive damages award from $17,000,000.00 to $5,832,974.34.

{¶ 20} A three-day hearing on attorney's fees was held during late February and early March of 2009. In a written decision filed on December 11, 2009, the trial court awarded ITC $2,941,502.31 in attorney's fees, but denied ITC's motion for prejudgment interest.

{¶ 21} The instant appeal of AMTI and cross-appeal of ITC are now properly before us.

II

{¶ 22} Because they are interrelated, AMTI's first, second, and third assignments of error will be discussed together as follows:

{¶ 23} "THE TRIAL COURT ERRED IN DENYING AMTI'S MOTIONS FOR SUMMARY JUDGMENT BECAUSE ITC FAILED TO DEMONSTRATE A GENUINE ISSUE OF MATERIAL FACT THAT AMTI WAS THE PROXIMATE CAUSE OF ITC NOT WINNING THE AUGUST 2001 MOBILITY SPO CONTRACT."

{¶ 24} "THE TRIAL COURT ERRED IN DENYING AMTI'S MOTION FOR A DIRECTED VERDICT ON ALL CLAIMS BECAUSE ITC PRODUCED NO

EVIDENCE ON THE ESSENTIAL ELEMENT OF CAUSATION."

{¶ 25} "THE TRIAL COURT ERRED IN DENYING AMTI'S MOTIONS FOR JNOV ON ALL CLAIMS BECAUSE A REASONABLE JURY COULD NOT CONCLUDE THAT ITC PROVED CAUSATION."

Motions for Summary Judgement

{¶ 26} In its first assignment, AMTI contends that the trial court erred by overruling its two motions for summary judgment. Specifically, AMTI argues that ITC failed in its burden of coming forward with evidence which demonstrated the existence of a genuine issue regarding whether AMTI proximately caused the damages sustained by ITC when it lost the bid for the Mobility SPO contract. AMTI claims that ITC finished behind three other competitors in the bidding for the Mobility SPO contract in August of 2001. Specifically, AMTI asserts that evidence of the Air Force's ranking of the candidates established that ITC would not have won the Mobility SPO contract even if AMTI had not interfered with ITC's incumbent employees. Thus, AMTI argues that ITC cannot prove, as a matter of law, that AMTI proximately caused it damages.

{¶ 27} ITC argues that conflicting evidence existed at the time the motions for summary judgment were filed regarding whether ITC stood behind any of the other competitors in the ranking for the bids for the Mobility SPO contract. More importantly, ITC asserts that the Air Force's main concern in accepting a bid for the August 2001 Mobility SPO contract was that it keep the incumbent employees in place to perform the contract. ITC further asserts that the only reason that AMTI won the contract was because it promised the Air Force that it could provide ITC's

incumbent workforce. Throughout the course of the litigation, ITC has consistently maintained that it would have won the Mobility SPO contract but for AMTI's tortious interference with ITC's incumbent workforce.

**Standard of Review**

{¶ 28} An appellate court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105. We apply the same standard as the trial court, viewing the facts in the case in a light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party. *Viock v. Stowe-Woodward Co.* (1983), 13 Ohio App.3d 7, 12.

{¶ 29} Pursuant to Civil Rule 56(C), summary judgment is proper if:

{¶ 30} "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327. To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293. The non-moving party must then present evidence that some issue of material fact remains for the trial court to resolve. *Id.*

{¶ 31} "Causation" refers to the cause and effect relationship between tortious conduct and a loss that must exist before liability for that loss may be

imposed. *Dobran v. Franciscan Med. Ctr.*, 149 Ohio App.3d 455, 459, 2002-Ohio-5378. While difficult to define, "proximate cause" is generally established "'where an original act is wrongful or negligent and, in a natural and continuous sequence, produces a result [that] would not have taken place without the act.'" *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 287. It is also well settled that because the issue of proximate cause is not open to speculation, conjecture as to whether the breach of duty caused the particular damage is not sufficient as a matter of law. See *Townsley v. Cincinnati Gardens, Inc.* (1974), 39 Ohio App.2d 5, 9. Further, a plaintiff must establish proximate cause by a preponderance of the evidence. See *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988)*,* 39 Ohio St.3d 86, 92.

{¶ 32} In its merit brief, AMTI relies on two cases which it maintain support its contention that ITC failed to establish that it would have won the Mobility SPO but for the conduct of AMTI. In *Costaras v. Dunnerstick*, Lorain App. No. 04CA008453, 2004-Ohio-6266, a teacher employed by Clearview school district sought employment with a competing school district. Id. The Clearview superintendent contacted the superintendent from the competing district and informed him that the teacher was already employed by Clearview and therefore, unavailable for other employment. Id. The teacher brought suit against Clearview, alleging tortious interference with a business opportunity. Id.

{¶ 33} The appellate court held that the trial court erred when it failed to grant Clearview's motion for directed verdict because the teacher failed to produce any evidence, other than her own testimony, that she would have been awarded the

new teaching position but for the Clearview superintendent's decision to contact the superintendent from the other school district. Id. The court specifically found that the teacher's speculative testimony regarding how the prospective employer may have reacted to the call from Clearview's superintendent was insufficient to support the element of proximate cause. Id.

{¶ 34} In *Technology for Energy Corp. v. Scandpower, A/S* (C.A. 6, 1989), 880 F.2d 875, the Sixth Circuit Court of Appeals affirmed the district court's decision sustaining the defendants' motion to dismiss pursuant to Fed.R.Civ.P. 41 finding that the plaintiff failed to prove that it probably would have been awarded a contract but for defendants' wrongful interference, as required under California law. The court concluded that its decision "prevents the plaintiff from obtaining a 'windfall' in the form of damages for interference with an economic opportunity which it would not have obtained even if the defendant had done nothing wrong." Id.

{¶ 35} Upon review, we conclude that the facts in *Costaras* and *Scandpower* are distinguishable from the facts in the instant case. Initially, we note that the holdings in *Costaras* and *Scandpower* are distinguishable. In neither case relied upon by AMTI did the plaintiffs come forward with convincing evidence which created a genuine issue regarding whether they would have been awarded employment (*Costaras*) nor a contract (*Scandpower*) but for the actions of the defendants. Herein, ITC presented sufficient facts establishing a genuine issue regarding whether the actions of AMTI proximately caused ITC to lose the Mobility SPO contract in August of 2001. Although AMTI presented evidence that ITC

ranked fourth out of five bidders in the competition for the contract in August of 2001, ITC relied upon the deposition testimony of Fred Whitican, AMTI's Dayton Operations Manager, who stated that the continued service of ITC's incumbent employees was of primary concern to the Air Force when deciding to whom to award the Mobility SPO contract after re-competing the contract in August of 2001. While relevant to our inquiry, AMTI's list provided by Lt. Karraker that ranks the August of 2001 bidders is not the smoking gun which AMTI portrays to be. The list is simply another piece of evidence to be taken into account when determining whether AMTI is liable for ITC's loss of the Mobility SPO contract in August of 2001. Moreover, we note that the testimony provided by Lt. Karraker was partially undermined by the fact that he submitted two sworn affidavits which contain conflicting and contradictory averments. We also note that ITC presented evidence that in the absence of KTT's and AMTI's tortious conduct prior to the first bid in May of 2001, ITC would have been the only entity to submit a bid at that time and would have been awarded the Mobility SPO contract, thus obviating the need to issue a second RFP in August of 2001. Accordingly, the trial court did not err when it overruled AMTI's motions for summary judgment regarding the issue of whether it proximately caused ITC to lose the Mobility SPO contract in August of 2001.

B. Motion for Directed Verdict

{¶ 36} As we recently stated in *Stephenson v. Upper Valley Family Care, Inc.*, Miami App. No. 07CA12, 2008-Ohio-2899:

{¶ 37} "Motions for a directed verdict during trial and for a judgment

notwithstanding the verdict following trial are authorized by Civ.R. 50(A) and (B), respectively. 'The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions. McNees v. Cincinnati Street Ry. Co. (1949), 152 Ohio St. 269, 89 N.E.2d 138; Ayers v. Woodard (1957), 166 Ohio St. 138, 140 N.E.2d 401; Civ.R. 50(A) and (B).' *Posin v. A.B.C. Motor Court Hotel, Inc.* (1976), 45 Ohio St.2d 271, 275."

{¶ 38} AMTI argues that it was entitled to a directed verdict because ITC failed to adduce any evidence during trial that the Air Force would have awarded it the Mobility SPO in August of 2001 but for AMTI's conduct. ITC, however, contends that it did, in fact, prove that AMTI's tortious conduct proximately caused ITC to lose the contract. Specifically, ITC asserts that AMTI's tortious conduct and conspiracy with KTT and the individual defendants resulted in the Air Force's decision to award the Mobility SPO contract to AMTI, rather than ITC, in August of 2001, based upon AMTI's bid promising the return of ITC's incumbent employees.

{¶ 39} It is undisputed that in May of 2001, only ITC and KTT submitted bids to the Air Force for the Mobility SPO contract. We note that the Air Force invited

four or five contractors to submit bids for the Mobility SPO contract in May of 2001, but only ITC and KTT did so. ITC argues that the remaining contractors did not submit bids because ITC's position as the incumbent contractor provided too strong an advantage in the May competition.

{¶ 40} Moreover, the evidence established that AMTI conspired with KTT for approximately one year prior to the RFP in May of 2001, in an effort to help KTT win the bid away from ITC. However, once the trial court enjoined KTT and the individual defendants from competing against ITC in May of 2001, the Air Force decided that the May RFP was "tainted" and cancelled the bid. The Air Force then decided to re-compete the Mobility SPO contract in August of 2001. Accordingly, ITC asserts that had AMTI not tortiously interfered with the May 2001 RFP, there would have been no need to issue another RFP in August of 2001. ITC would have been the sole bidder in the May competition and ostensibly would have been awarded the contract. We also note that ITC adduced evidence that AMTI and KTT improperly influenced the Air Force to issue the August of 2001 RFP absent the former requirement of including the proposed employees' resumes as part of the bid. As a result, ITC asserts that multiple contractors who had not previously submitted a bid in the May of 2001 RFP decided to submit bids in response to the August of 2001 RFP.

{¶ 41} Throughout the course of the case, ITC argued that the Air Force's chief concern in re-competing the Mobility SPO contract in August of 2001 was retaining ITC's incumbent workforce. Accordingly, ITC asserts that without the incumbent employees, a contractor would not stand much of a chance of winning

the Mobility SPO contract. Specifically, Carl Canter testified that it is very difficult to be awarded a government contract over the incumbent contractor who employs the incumbent workforce, and it does not happen very often. Canter further testified that ITC should have been awarded the Mobility SPO contract simply because it was the incumbent contractor and had a strong record of past performance with the Air Force. Anita Talwar testified that AMTI did not typically bid against a strong incumbent.

{¶ 42} Fred Whitican provided the following testimony at trial regarding the necessity of being able to instantly deliver ITC's incumbent workforce upon being awarded the Mobility SPO contract:

{¶ 43} "Whitican: *** We knew that Colonel Earehart and Mike Karraker and Theresa Abney all wanted to have that same incumbent team back supporting them the day after the [Mobility SPO] contract was awarded. So that was their intent. *You know, that's how you win the contract, by giving the government what they want.*

{¶ 44} "***

{¶ 45} "ITC Counsel: So – so at this point you recognized that, really, from your point of view, the [Air Force] didn't care about your expertise at all. They just wanted you to deliver the incumbents, and you believe they wanted you to deliver KTT, right?

{¶ 46} "Whitican: Because when I met with Mike Karraker after we won [the Mobility SPO contract], Mike Karraker flat out told me, *AMTI did not win this contract, the* [incumbent] *employees won this contract for you.*"

{¶ 47} Upon review, we conclude that the trial court did not err when it overruled AMTI's motion for directed verdict because ITC adduced sufficient evidence during the trial from which a reasonable person could find by a preponderance of the evidence that AMTI proximately caused ITC to lose the Mobility SPO contract in August of 2001 by promising the immediate availability of ITC's incumbent employees if it was awarded the Mobility SPO contract. Construed in a light most favorable to ITC, the evidence adduced at trial established that AMTI won the Mobility SPO contract because it convincingly represented to the Air Force that it had procured commitments from ITC's incumbent employees in derogation of ITC's contractual rights pursuant to the employment contracts entered into by the incumbent personnel. Accordingly, but for AMTI's tortious actions in that regard, ITC would have been awarded the Mobility SPO contract in August of 2001.

C. Motion for JNOV

{¶ 48} "A motion for judgment notwithstanding the verdict presents an issue of law. Though the court does not weigh the evidence or consider the credibility of the witnesses, the court must evaluate the evidence for its sufficiency in relation to the legal standard governing the claim or defense which the motion involves. Furthermore, being a finding as a matter of law, the trial court's judgment granting or denying the motion is reviewed on appeal de novo." *O'Day v. Webb* (1972), 29 Ohio St.2d 215.

{¶ 49} Initially, AMTI asserts that the trial court did not apply the correct legal standard in order to assess whether it proximately caused ITC to lose the Mobility

SPO contract in August of 2001. In support of this assertion, AMTI directs us to a portion of the trial court's decision overruling its motion for JNOV issued on July 10, 2008, wherein the court stated as follows:

{¶ 50} "The general rule is that a defendant's conduct is the proximate cause of injury or death to another *if the defendant's conduct (1) is a 'substantial factor' in bringing about the harm* and (2) there is no other rule of law relieving the defendant of liability. *State v. Carter*, Montgomery App. No. 21820, 2007-Ohio-5570 (comparing the causation standard in criminal cases to the proximate cause standard in civil cases)."

{¶ 51} In light of the excerpt above, AMTI argues that the trial court incorrectly utilized the "substantial factor" test, rather than the "but for" test, when it determined that AMTI proximately caused ITC to lose the Mobility SPO contract in August of 2001. Upon review, however, it is clear that the trial court merely inserted a description of the "substantial factor" test used in criminal cases in an effort to compare it to the "but for" test applied in civil cases. With the exception of that particular citation in the decision, the trial court did not mention nor attempt to apply the "substantial factor" test when it overruled AMTI's motion for JNOV.

{¶ 52} In fact, the trial court clearly and unequivocally stated its reliance on the "but for" standard when it found as follows:

{¶ 53} "Second, reasonable minds could have found that, despite the much higher price tag, *ITC would have won the August 2001 bid **but for** AMTI promising WPAFB that it could guarantee the Incumbent Employees would continue on the project.*"

{¶ 54} Contrary to AMTI's assertion, the trial court did not apply the "substantial factor" test in it analysis. Rather, it is clear that the trial court properly utilized the "but for" test in order to determine whether AMTI's tortious acctions proximately caused ITC to lose the Mobility SPO contract in August of 2001.

{¶ 55} Construing the evidence most strongly in favor of the non-moving party, ITC in this case, we find that the trial court's decision overruling AMTI's motion for JNOV was supported by substantial evidence. When ITC is afforded the benefit of all reasonable inferences from the evidence, it is clear that the trial court did not err, and the jury's verdict finding that AMTI proximately caused ITC to lose the Mobility SPO contract in August of 2001 should not be set aside.

{¶ 56} Accordingly, AMTI's first, second, and third assignments of error are overruled.

III

{¶ 57} Because AMTI's fourth assignment of error and ITC's first cross-assignment of error are interrelated, they will be discussed together as follows:

{¶ 58} "THE TRIAL COURT ERRED IN DENYING AMTI'S MOTION FOR A NEW TRIAL ON ALL CLAIMS AND IN CONDITIONALLY GRANTING AMTI'S MOTION FOR REMITTITUR."

{¶ 59} "THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT THE JURY'S COMPENSATORY DAMAGES VERDICTS WERE NOT SUPPORTED BY COMPETENT, CREDIBLE EVIDENCE AND, ACCORDINGLY, GRANTING AMTI'S MOTION FOR REMITTITUR."

{¶ 60} In its fourth assignment, AMTI contends that the trial court erred by overruling its motion for a new trial regarding all of ITC's claims for relief. AMTI also argues that the trial court erred when it remitted the compensatory damages awarded by the jury from $5,752,894.00 to $1,970,599.44. Specifically, AMTI argues that the remitted amount was not supported by competent and credible evidence and should have been reduced further by the trial court. Conversely, ITC argues that the jury's compensatory damages verdicts were appropriate and that the trial court erred by granting AMTI's motion for remittitur.

{¶ 61} Following the jury verdict, AMTI filed a motion for new trial pursuant to Civ. R. 59(A)(6) and an alternative motion for vacatur or remittitur of the compensatory and punitive damages awards. The trial court overruled the motion for new trial, but granted AMTI's request for remittitur regarding the compensatory damages. AMTI argues that it is entitled to a new trial because the jury verdict was not sustained by the weight of the evidence and is contrary to law. AMTI further asserts that the trial court's remittitur "failed to remedy the legal errors inherent in the jury verdict" with respect to the compensatory damages award.

{¶ 62} Whether to grant or deny a motion for a new trial rests with the sound discretion of the trial court, and its judgment will not be disturbed absent an abuse of discretion. *Yungwirth v. McAvoy* I (1972), 32 Ohio St.2d 285. An abuse of discretion is shown when a decision is unreasonable; that is, when there is no sound reasoning process that would support the decision. *AAA Enterprises v. River Place Community* (1990), 50 Ohio St.3d 157.

{¶ 63} "Civ. R. 59(A)(6) authorizes the trial court to vacate a judgment and

order a new trial on a finding that the verdict on which the judgment was entered 'is not sustained by the weight of the evidence.' When that claim is made, the court must review the evidence and pass in a limited way on the credibility of the witnesses. (Internal citations omitted). It must appear to the court that a manifest injustice has been done and that the verdict is against the manifest weight of the evidence. *Rohde v. Farmer* (1970), 23 Ohio St.3d 82. For example, where it appears probable that a verdict is based on false testimony, a motion for a new trial should be granted. (Internal citations omitted). A verdict is not against the manifest weight of the evidence merely because the judge would have decided the case differently. (Internal citations omitted). If the jury's verdict is supported as to each element of the plaintiff's case by some competent and apparently credible evidence, a defendant's motion for new trial should not be granted. (Internal citations omitted). Conversely, if evidence the defendant offered to rebut one or more of those elements of the plaintiff's case is competent and apparently credible, a plaintiff's motion should not be granted." *Bedard v. Gardner,* Montgomery App. No. 20430, 2005-Ohio-4196.

{¶ 64} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Construction Co.* (1978), 54 Ohio St.2d 279, syllabus. A judgment is not against the manifest weight of the evidence unless "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the jury

clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Bede v. The Dayton Power & Light Co.*, Montgomery App. No. 18705, 2002-Ohio-2378. In determining whether a judgment is against the manifest weight of the evidence, there is "a presumption that the findings of the trier-of-fact were indeed correct." *Seasons Coal Co. v. City of Cleveland* (1984), 10 Ohio St.3d 77, 80.

{¶ 65} AMTI initially argues that a new trial should have been granted because the jury verdict was not supported by competent and credible evidence regarding whether but for the tortious conduct of AMTI, ITC would have won the Mobility SPO contract. As we thoroughly discussed in our analysis of AMTI's second and third assignments of error, ITC presented ample evidence during trial from which a reasonable person could find by a preponderance of the evidence that AMTI proximately caused ITC to lose the Mobility SPO contract in August of 2001 by promising the immediate availability of ITC's incumbent employees if it was awarded the Mobility SPO contract. The evidence adduced by ITC established that the contractor who could provide the incumbent employees would be awarded the Mobility SPO contract. ITC was the only contractor that could legally state that it could provide the incumbent workforce in its bid to the Air Force. By essentially stealing ITC's incumbent employees, who were clearly a prized asset of the Air Force, AMTI ensured that it would be awarded the Mobility SPO contract and that ITC would lose the bid. Accordingly, we conclude that ITC adduced competent and credible evidence which established that but for the actions of AMTI, ITC would have won the Mobility SPO contract.

{¶ 66} In its second argument in support of this assignment, AMTI contends that under Civ. R. 59(A)(7), it "is entitled to a new trial on all claims because the jury's verdict is contrary to the trial court's jury instructions." Under Civ. R. 59(A)(7), a trial court can grant a new trial if the judgment rendered is contrary to law.

{¶ 67} AMTI argues that because the jury's verdict was in excess of the amount of lost profits introduced into evidence that they are entitled to a new trial. The jury's instructions allowed the jury to award compensatory damages in an amount reasonably determined by (1) the actual loss, or lost profits, caused to ITC, or (2) any unjust enrichment gained by the defendants, whichever was greater. The amount of lost profits was to be determined by calculating how much money ITC would have received from complete performance of the contract with Mobility SPO, minus any costs saved, if AMTI had not interfered with the contract. However, the jury instructions were clear in limiting the amount of lost profits to only the base year of the Mobility SPO contract. It is undisputed that the lost profits on the base year of the contract would have been $1,247,638.00. Despite the limitation on the amount of lost profits, the jury returned a verdict in the amount of $5,752,894.00, an award $4,505,256.00 in excess of the lost profits limit. After denying AMTI's motion for a new trial, the trial court granted its motion for remittitur and reduced the amount of compensatory damages to $1,970,599.44. ITC accepted the remitted amount.

{¶ 68} AMTI further asserts that because the jury disregarded the court's instructions in assessing damages that a new trial, and not remittitur, was the only

proper remedy. We disagree. The assessment of damages is usually entirely within the discretion of the jury, and the court is disallowed to alter a jury's decision. *Menda ex rel. Justin v. Springfield Radiologists, Inc*, Clark App. No. 2001-CA-91, 2002-Ohio-6785. However, "a remittitur is proper if the jury's award is so excessive as to appear to be the result of passion or prejudice, or if the amount awarded is against the manifest weight of the evidence." Id. We have recognized a four part test in allowing a court to grant remittitur, "(1) unliquidated damages are assessed by a jury, (2) the verdict is not influenced by passion or prejudice, (3) the award is excessive, and (4) the plaintiff agrees to the reduction in damages." *Bd. of Trustees of Sinclair Community College Dist. v. Farra*, Montgomery App. No. 22886, 2010-Ohio-568.

{¶ 69} The facts present in the instant case satisfy the test for allowing a court to grant remittitur. First, the damages assessed here were the amount of lost profits to ITC stemming from AMTI's actions. This was not an assessment of a liquidated damages award. Second, there is no evidence on the record to find that the jury was influenced by passion or prejudice. Third, the award was excessive. The uncontested evidence introduced at trial found ITC's lost profits on the base year of the Mobility SPO contract to be $1,247,638.00. Lastly, ITC agreed to the remitted damages amount. Accordingly, the trial court was within its discretion to remit the amount of the jury award to the damages supported by the weight of the evidence pursuant to our ruling in *Farra*, and the granting of a new trial was not appropriate in this case.

{¶ 70} The present case is distinguishable from the *Davis* and *Baeppler*

cases cited in AMTI's brief. In *Baeppler*, the Eighth District stated that it would have awarded the defendants a new trial, had they not vacated the judgment entirely, on a finding that the jury's verdict was contrary to law. *Baeppler v. McMahan* (Apr. 13, 2000), Cuyahoga App. No. 74938, 75131, 76042. The issue with the jury verdict in *Baeppler*, however, was not that the award was in excess of the evidence presented at trial. Id. The verdict was contrary to law in *Baeppler* because the damages awards were inconsistent as applied to all the defendants. Id. Because the plaintiff had argued liability under a theory of respondeat superior, the judgment required, by law, a finding that either the employer was not liable at all for the actions of its employee, or that it was *equally responsible*. Id. Thus, a jury award of differing damages amongst the defendants was contrary to law, and a new trial would have been appropriate. Id. That is not at issue in the instant case. The damages award was not inconsistent as applied to the defendants, but in excess of the determined lost profits, making remittitur an appropriate order.

{¶ 71} Furthermore, the circumstances in *Davis* that warranted a new trial on the damages award are also not present in this case. In *Davis,* the Fourth District found that the trial court abused its discretion in not granting the motion for new trial. *Davis v. Gampp* (Dec. 6, 1999), Athens App. No. 98CA2596. In *Davis*, the court found that the verdict form was substantively defective and, therefore, contrary to law. Id. In instructing the jury, the trial court specifically stated that any damage amount must be limited to twenty dollars per day, for an eleven day period. Id. Although the maximum award could have only been $220, the jury returned an award in the amount of $1,170.00. Id. *Davis* is distinguishable because the jury

was not instructed as to the exact amount it could award, but was told to make reasonable approximation as to the amount of damages. Moreover, unlike *Davis*, the trial court in the instant case had the power to remedy the jury's excessive award by remitting the damages amount which was accepted by ITC. Therefore, a new trial was not necessary to correct the amount of compensatory damages awarded by the jury.

{¶ 72} In its next argument, AMTI argues that the judgment was contrary to the court's instructions because the jury awarded duplicative compensatory damages. In the alternative, AMTI contends that it is entitled to further remittitur because the remitted amount is contrary to law.

{¶ 73} Initially, we note that the remittitur ordered by the trial court on the jury's award of compensatory damages was proper given the court's finding that there was no evidentiary basis for the jury's original award of $5,752,894.00. Specifically, the trial court found that ITC was limited to presenting evidence of its lost profits for the base year of the Mobility SPO contract since the evidence of damages for the years following the base year of the contract was too speculative. It is undisputed that the lost profits for the base year of the contract were $1,247,638.00, as testified to by Joseph Springer, ITC's expert.

{¶ 74} Moreover, the trial court instructed the jury several times that it could not award duplicative damages. Despite the admonition, the jury awarded ITC $5,752,894.00 in compensatory damages. Finding that this award was unsupported by the evidence, as well as the information in the verdict forms, the trial court remitted the amount of compensatory damages to $1,970,599.44. We

note that the final jury instructions read by the trial court state as follows:

{¶ 75} "Lost profits are calculated by deciding what ITC would probably have received from performing the contract for the Mobility SPO had Defendants not committed their wrongful acts. From this sum, you should subtract the amount, if any, of variable costs that ITC saved by not performing the contract for the Mobility SPO. *With respect to lost future profits, ITC's evidence need only be reasonable, not specific.*"

{¶ 76} In light of the portion of the instructions regarding lost future profits, it is understandable that the jury may have attempted to compensate ITC for the profits it would have generated after performing the base year of the Mobility SPO contract, assuming, of course, that ITC was awarded the contract for the following years. That could explain the additional four million dollars the jury awarded to ITC in compensatory damages against AMTI. The verdict forms are inconclusive in this regard. Nevertheless, in a pre-trial ruling, the trial court expressly limited ITC to presenting evidence of its lost profits for only the base year of the Mobility SPO contract since the court considered the evidence of damages for the years following the base year to be too speculative. We note that the jury instructions stated as follows:

{¶ 77} "*** Because every contract year for the Mobility SPO beyond the base year was a discretionary option by the government, ITC's damages are limited to the lost profits it would have earned on the base year of the Mobility SPO contract."

{¶ 78} The jury instructions further state in pertinent part:

{¶ 79} "While ITC asserted three separate claims against AMTI, ITC *has asserted a single form of injury of lost profits or unjust enrichment, whichever is greater.* *** If you find, however, that ITC has satisfied its burden of proof on any of its claims, *it would be entitled to a single award of damages ***.*"

{¶ 80} Contrary to AMTI's assertions, the trial court's remitted compensatory damages award did not contain any duplicative sums. In light of the trial court's pre-trial rulings, as well as the plain language in the jury instructions, the jury was limited to the value in lost profits for base year of the Mobility SPO contract regarding the assessment of compensatory damages against AMTI.

{¶ 81} That limitation, however, did not affect the jury's assessment of compensatory damages against KTT for misappropriation of trade secrets. The jury was specifically instructed that "ITC [was] entitled to recover compensatory damages that may include: (1) the actual loss to ITC proximately caused by the misappropriation; or (2) the amount gained by AMTI *and/or KTT* from its wrongful use of ITC's trade secrets, whichever is greater." Accordingly, the jury was free to assess separate compensatory damages against KTT without regard to the Mobility SPO contract base year limitation on compensatory damages against AMTI. A distinct basis, therefore, clearly exists for the jury's $471,744.00 award against KTT to ITC, and the amount was not duplicative of any sums assessed against AMTI in compensatory damages.

{¶ 82} Thus, the trial court properly remitted the amount of compensatory damages for which there was no evidentiary basis presented at trial.

{¶ 83} Using the verdict forms completed by the jury as a guide, the trial court

calculated the remitted compensatory damages as follows:

{¶ 84} "ITC's lost profits, as testified to by Springer = $1,247,638.00

{¶ 85} "+

{¶ 86} "Damages attributed to KTT, imputed to AMTI as a result of civil conspiracy = $471,744.00

{¶ 87} "+

{¶ 88} "Damages attributed to the individual defendants (disgorgement of salaries), imputed to AMTI as a result of civil conspiracy = $251,217.44

{¶ 89} "= $1,970,599.44 (Total Remitted Compensatory Damages Awarded by trial court)."

{¶ 90} AMTI, however, argues that it is entitled to further remittitur because the trial court's remitted award improperly imputed the damages awarded against KTT to AMTI when the jury did not find that a civil conspiracy existed between AMTI and KTT. To establish a claim of civil conspiracy, a plaintiff must prove (1) a malicious combination, (2) involving two or more persons, (3) causing injury to person or property, and (4) the existence of an unlawful act independent from the conspiracy itself. *Werthmann v. DONet, Inc.*, Montgomery App. No. 20814, 2005-Ohio-3185, ¶93. "The malice portion of the tort is 'that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.'" *Gibson v. City Yellow Cab Co.* (Feb. 12, 2001), Summit App. No. 20167 (citations omitted). To recover for civil conspiracy, the plaintiff must suffer actual damages. *Reno v. City of Centerville*, Montgomery App. No. 20078, 2004-Ohio-781, ¶33; see *Danis v. Great Am. Ins. Co.*, 159 Ohio App.3d

119, 133, 2004-Ohio-6222.

{¶ 91} In support of it argument, AMTI draws our attention to Juror Interrogatories nine and ten, which state in pertinent part:

{¶ 92} "9, if you find by the greater weight of the evidence that AMTI engaged in a civil conspiracy with individual defendants or ITC's employees to cause ITC harm, again, you have a yes or no answer. ***

{¶ 93} "10, civil conspiracy, do you find that AMTI's engagement in civil conspiracy with individual defendants or ITC's employees to cause ITC harm was the proximate cause of ITC's damages. ***"

{¶ 94} Specifically, AMTI argues that neither interrogatory asked the jurors to decide whether AMTI engaged in a civil conspiracy with KTT, only the individual defendants. Therefore, AMTI contends that it could not be held jointly and severally liable for damages attributed to KTT for civil conspiracy. AMTI, however, ignores the effect of Juror Interrogatory 14, as well as a portion of the jury instructions referencing joint and several liability in regards to civil conspiracy.

{¶ 95} Juror Interrogatory 14 states in pertinent part:

{¶ 96} "14, state the amount of compensatory damages sustained by ITC, if any, from its loss of the contract *that occurred as a result of AMTI's civil conspiracy with the other defendants. ***"*

{¶ 97} ITC argues that the "other defendants" discussed in this interrogatory refer to KTT and the individual defendants. Accordingly, it was not unreasonable for the jury to find that AMTI was jointly and severally liable for the $471,744.00 in compensatory damages attributed to KTT for civil conspiracy. This interpretation is

further strengthened by the jury instructions which state in pertinent part:

{¶ 98} "*If you find that AMTI conspired with KTT and/or the individual defendants, AMTI will be jointly and severally liable for the damages KTT and the individual defendants owe ITC.* This means that while the individual defendants and KTT will still be liable for any damages they caused ITC to incur, AMTI will also be liable for the damages incurred by *the other defendants'* acts."

{¶ 99} Thus, we conclude that it was neither unreasonable nor contrary to law for the trial court to include in its remitted compensatory damages award against AMTI the $471,744.00 attributed to KTT for civil conspiracy. The jury correctly found, based on the jury instructions and interrogatories, that AMTI conspired with KTT, and that AMTI was, therefore, liable for damages awarded against KTT.

{¶ 100} Lastly, AMTI argues that it is entitled to further remittitur because the remitted award erroneously imputes disgorgement of wages and benefits paid to the individual defendants to AMTI. Specifically, AMTI argues that the individual defendants' disgorgement cannot be attributed to AMTI as part of a conspiracy because the jury determined that the individual defendants caused ITC zero dollars in damages as a result of the conspiracy. We disagree.

{¶ 101} The instruction for civil conspiracy broadly states that if the jury found that "AMTI conspired with KTT and/or the individual defendants, AMTI will be jointly and severally liable for the damages KTT and the individual defendants owe ITC." Ultimately, the jury found that the individual defendants were collectively liable to ITC in the amount of $251,217.44. Pursuant to the jury instructions, AMTI is jointly

and severally liable to ITC for that amount. While AMTI correctly observed that disgorgement is a penalty imposed for unfaithful performance, it does not cite any authority in support of its argument that it cannot be held jointly and severally liable for the individual defendants' disgorgement of compensation.

{¶ 102} In a civil conspiracy, the acts of co-conspirators are attributable to one another. *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464. Moreover, a co-conspirator may be liable for both compensatory and punitive damages resulting from the conspiracy. Accordingly, the trial court did not err when it added the individual defendants' disgorged wages and benefits to the amount of compensatory damages for which AMTI was jointly and severally liable.[1]

{¶ 103} AMTI's fourth assignment of error is overruled, as is ITC's first cross-assignment of error.

IV

{¶ 104} Because they are interrelated, AMTI's fifth assignment of error and ITC's second cross-assignment of error will be discussed together:

{¶ 105} "THE TRIAL COURT'S REMITTED AWARD OF PUNITIVE DAMAGES IS UNCONSTITUTIONALLY EXCESSIVE AND VIOLATES OHIO'S LIMITS ON PUNITIVE DAMAGES."

{¶ 106} "THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT

---

[1] We note that although the trial court specifically found that AMTI was jointly and severally liable for the tortious actions of KTT and the individual defendants, the court did not include the information in the general verdict required in a jury action pursuant to R.C. 2307.22 and R.C. 2307.23 regarding the percentages of tortious conduct attributable to the various defendants. AMTI, however, did not object to the trial court's omission at any stage during the

THE JURY'S PUNITIVE DAMAGES VERDICT WAS NOT SUPPORTED BY COMPETENT, CREDIBLE EVIDENCE AND, ACCORDINGLY, GRANTING AMTI'S MOTION FOR REMITTITUR."

{¶ 107} In its fifth assignment, AMTI contests the trial court's remitted punitive damages award as unconstitutionally excessive and violative of Ohio's legal standards governing punitive damages. We disagree.

{¶ 108} Initially, we note that the assessment of damages lies "so thoroughly within the province of the [trier of fact] that a reviewing court is not at liberty to disturb the [trier of fact's] assessment" absent an affirmative finding of passion and prejudice, or a finding that the award is manifestly excessive or inadequate. *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 655, 1994-Ohio-324. A new trial may be granted due to "excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice." Civ.R. 59(A)(4). Whether to grant or deny a motion for a new trial rests with the sound discretion of the trial court, and its judgment will not be disturbed absent an abuse of discretion. *Yungwirth v. McAvoy* I (1972), 32 Ohio St.2d 285. An abuse of discretion is shown when a decision is unreasonable; that is, when there is no sound reasoning process that would support the decision. *AAA Enterprises v. River Place Community* (1990), 50 Ohio St.3d 157.

{¶ 109} The U.S. Supreme Court has held that punitive damages awards violate due process when the awards can be characterized as "grossly excessive" in relation to the state's legitimate interest in punishing unlawful conduct and

instant litigation. Accordingly, AMTI has waived any error in this regard.

deterring its repetition. *Wightman v. Consolidated Rail Corp.*, 86 Ohio St.3d 431, 439, 1999-Ohio-119. The U.S. Supreme Court identified three "guideposts" to be used when determining whether punitive damages awards are unconstitutionally excessive: "1) the degree and reprehensibility of the defendant's conduct; 2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and 3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Blust v. Lamar Advertising Co.*, Montgomery App. No. 19942, 2004-Ohio-2433, quoting *State Farm Mut. Auto Ins. Co. v. Campbell* (2003), 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585; *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809.

{¶ 110} "The degree of reprehensibility of the defendant is '[p]erhaps the most important indicium of the reasonableness of a punitive damages award.'" *Winner Trucking, Inc. v. Victor L. Dowers & Assoc.*, Darke App. No. 1695, 2007-Ohio-3447, quoting *BMW*, 517 U.S. at 575. In assessing the reprehensibility of the conduct in question, courts are to consider five factors: "1) whether the harm caused was physical as opposed to economic; 2) whether the tortious conduct evinced a reckless disregard of the health or safety of others; 3) whether the target of the conduct had financial vulnerability; 4) whether the conduct involved repeated actions or was an isolated incident; and 5) whether the harm was the result of intentional malice, trickery, deceit, or mere accident." *State Farm*, 538 U.S. at 419. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all them

renders any award suspect." Id.

{¶ 111} It is in the area of reprehensibility that AMTI fares most poorly. The trial court found that four of the five reprehensibility factors existed in the instant case which justified a substantial award of punitive damages. First, the trial court found that the harm evinced by AMTI against ITC was clearly economic rather than physical. While the court found that no evidence was presented which related to the personal safety of ITC or its employees, it found that AMTI's tortious conduct evinced a reckless disregard for ITC's rights with respect to the employment contracts with its incumbent employees, as well as ITC's rights with respect to the expectation of privacy for their trade secrets. Upon review, we agree with the trial court that while the first factor was not present, AMTI sufficiently disregarded ITC's rights in order to meet the second reprehensibility factor.

{¶ 112} With respect to the third factor, the trial court found that ITC presented sufficient evidence of financial vulnerability. Canter testified that bidding for government contracts is very competitive and that it is difficult to get "invited to the dance." By tortiously interfering with ITC's incumbent employees and unfairly winning the contract, AMTI guaranteed that ITC would not be awarded the Mobility SPO contract, thereby reducing the ability of a private contractor to generate income. ITC adduced evidence which established that it lost approximately one-third of its business as a result of AMTI's tortious conduct. Arguably more important to ITC was the loss of twenty-two of its highly skilled and valuable employees. "Although the present case undisputedly presents economic rather than physical harm, cases involving economic injury nonetheless may warrant an

award of substantial punitive damages when the harm is committed 'intentionally through affirmative acts of misconduct or when the party is financially vulnerable.'" *Am. Chem. Soc. v. Leadscope*, Franklin App. No. 08AP-1026, 2010-Ohio-2725, quoting *Gore*, 517 U.S. at 576.

{¶ 113} As for the fourth factor, the trial court found that AMTI's tortious conduct in the instant case was not an isolated incident. In fact, AMTI had a history of engaging in unfair and deceptive business practices dating back to 1998 involving the unauthorized use of a competitor's incumbent employees to gain an improper advantage in bidding for government contracts. Specifically, AMTI represented to the Federal Aviation Administration that it could supply employees from Overlook Systems Technology if it was awarded the contract. *AMTI v. Fed. Aviation Admin.* (C.A.D.C., 2000), 211 F.3d 633, 634-634. Overlook, however, had not agreed to certain labor rates proposed by AMTI. Id. at 635. AMTI, therefore, had no basis to claim that it could provide Overlook's incumbent employees. Id. AMTI was awarded the contract, but the FAA later determined that AMTI's representations regarding Overlook were unauthorized and reopened the bid. Id.

{¶ 114} After AMTI won the second bid and was awarded the contract, it initiated litigation against Overlook. *AMTI v. Overlook Sys. Technology, Inc.*, Va. Cir. No. 177962. Overlook counterclaimed against AMTI for breach of contract, tortious interference with contract, statutory business conspiracy, and fraud. Id. The jury ultimately found in favor of Overlook regarding all of its claims and awarded it compensatory and punitive damages. Id. The judgment in *Overlook* put AMTI on notice that its corporate practice involving interfering with another

company's incumbent employees was improper and illegal. Despite this revelation, AMTI proceeded to conspire with KTT and the individual defendants to ensure that ITC lost the Mobility SPO contract in order to tortiously acquire it for themselves. Accordingly, we find that the fourth reprehensibility factor was met.

{¶ 115} Regarding the fifth and final factor, the evidence adduced at trial supports a finding that AMTI's conduct involved intentional malice, trickery, and deceit. In conjunction with KTT and the individual defendants, AMTI designed and implemented a plan to obtain ITC's trade secrets and incumbent employees in order to win a government contract away from ITC. Clearly, this was no mere accident on AMTI's part. Additional evidence, including emails between KTT and employees at AMTI establish that AMTI was aware that its actions with respect to ITC's incumbent employees was improper. In fact, the bulk of evidence presented by ITC was premised upon AMTI's intentional deceptive acts, which were initiated in an effort to ensure that ITC lost and AMTI won the Mobility SPO contract. We also note that during the punitive damages phase of the trial after AMTI had been found liable, Talwar, Hooper, and Whitican still asserted that neither AMTI nor any of its employees had done anything wrong. Significantly, Talwar and Whitican both testified that AMTI still has a policy of obtaining proprietary information regarding competitors' incumbent employees in order to gain an unfair advantage in the bidding process for government contracts.

{¶ 116} Four of the five reprehensibility factors exist in the instant case. Therefore, an award of punitive damages was proper. Now, we must determine whether the trial court's decision to order a remittitur of the punitive damages was

proper, and if so, whether the remitted amount satisfies due process.

{¶ 117} As we recently stated in *Winner Trucking, Inc. v. Victor L. Dowers & Assoc.*, Darke App. No. 1695, 2007-Ohio-3447:

{¶ 118} "There is no magic formula for determining the proper amount of punitive damages. Rather, the amount that should be awarded is the amount that best accomplishes the twin aims of punishment and deterrence as to that defendant. 'We do not require, or invite, financial ruination of a defendant that is liable for punitive damages. While certainly a higher award will always yield a greater punishment and greater deterrent, the punitive damages award should not go beyond what is necessary to achieve its goals. The law requires an effective punishment, not a draconian one.' [*Dardinger v. Anthem Blue Cross & Blue Shield*, 98 Ohio St.3d 77, 2002-Ohio-7113, _178]."

{¶ 119} Upon this record, we find that the trial court did not err when it found that the punitive damages awarded by the jury were "unconstitutionally excessive," and remitted the amount of damages from $17,000,000.00 to $5,832,974.34. Although AMTI's actions in the instant case were particularly egregious, the jury's award of $17,000,000.00 was clearly excessive. No evidence exists on the record, however, to support a finding that the jury was motivated by passion or prejudice, and ITC accepted the trial court's remittitur of the punitive damages award. We conclude that the trial court did not abuse its discretion when it granted AMTI's motion for remittitur.

{¶ 120} After ordering remittitur, the trial court noted that the jury apparently used a 2.96:1 ratio for determining the original award of compensatory and punitive

damages, to wit: $5,752,894.00 in compensatory damages and $17,000,000.00 in punitive damages. Utilizing the same ratio, the trial court remitted the damages to $1,970,599.44 in compensatory and $5,832,974.34 in punitive damages.

{¶ 121} AMTI argues that the remitted damages award is still excessive and a 1:1 ratio between compensatory and punitive damages is the maximum award that is constitutionally permitted. In support of its argument, AMTI relies on two cases from the Sixth Circuit Court of Appeals for the proposition that no greater than a 1:1 ratio between compensatory and punitive damages is constitutionally permissible when the compensatory damages award is substantial. *Bach v. First Union Natl. Bank* (C.A.6, 2007), 486 F.3d 150 (ordering a remittitur of a $2,628,600.00 punitive damages award to $400,000.00 where the compensatory award was $400,000.00); *Clark v. Chrysler Corp.* (C.A.6, 2006), 436 F.3d 594 (ordering a remittitur of a $3,000,000.00 punitive damages award to $471,258.26 where the compensatory award was $235,629.26). We note that AMTI incorrectly asserts that the damages ratio in *Clark* was 1:1. Rather, the Sixth Circuit found that an award ratio of 2:1 was acceptable for due process purposes. *Clark*, 436 F.3d at 608.

{¶ 122} *Bach* involved a bank that continued to report unfavorable credit information regarding an elderly widow even after she contacted the bank and informed it that the information was inaccurate. *Bach*, 486 F.3d 150, 155. We note that the Sixth Circuit only found that two of the five reprehensibility factors existed in *Bach*. Id. Specifically, the court found that the bank did not act "with reckless disregard for the health and safety of others," engage in repeated instances of

misconduct, nor act with "intentional malice." Id.   The court acknowledged that the "absence of these factors substantially undercuts [the widow's] attempts to justify the size of the punitive damages in this case." Id.

{¶ 123} In *Clark*, the court found only one of the five reprehensibility factors weighed in favor of a large punitive damages award where a design defect in an automobile was found to have proximately caused the death of the driver. 436 F.3d at 605.   We note that the *Clark* court found that Chrysler's negligent conduct did not "replicate [any] prior transgressions," but was an isolated incident. Id. at 604. Moreover, the court found that Chrysler did not act with intentional malice, trickery or deceit, and did not intend to harm the decedent. Id. at 605.   Accordingly, the court further held that the factors viewed as a whole indicate that defendant's "conduct was not sufficiently reprehensible to support such a large punitive damage award." Id. at 605.

{¶ 124} In *State Farm*, the U.S. Supreme Court declined to impose a bright-line ratio which a punitive damages award cannot exceed, "but noted 'that few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.'" 538 U.S. at 425.   We recently approved a $35,000.00 punitive damages award against a car dealership, even though the compensatory damages award was only $4,776.00. *Smith v. GMC*, 168 Ohio App.3d 336, 347, 2006-Ohio-4283.   Therein, we stated as follows:

{¶ 125} "The ratio of punitive damages to the total actual injury suffered is less than 8 to 1.   Finally, we conclude that the large punitive damage award is appropriate in order to deter Walker from future conduct of the kind that occurred in

this case."

{¶ 126} In the instant case, four of the five reprehensibility factors are present. Specifically, AMTI essentially conspired to steal a lucrative government contract by promising the Air Force that it could deliver a competitor's incumbent employees. AMTI engaged in this tortious conduct even after being put on notice by the prior judgment in *Overlook* that its actions were illegal. "[E]vidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Gore*, 517 U.S. at 576-77. The evidence established that AMTI acted with intentional malice and fully intended to harm ITC. ITC lost one-third of its business and twenty-two of its employees as a direct result of AMTI's tortious conduct. AMTI never acknowledged that its conduct was illegal, nor did it acknowledge that it would refrain from said conduct in the future. In fact, Whitican testified that "that's the way business is done at [WPAFB] ***." Accordingly, the trial court did not err when it awarded ITC the remitted punitive damages award of $5,832,974.34. In light of AMTI's knowing and intentional tortious conduct, a substantial punitive damages award is appropriate, and a 2.96:1 ratio for determining the award of punitive and compensatory damages is not unconstitutionally excessive. Such an award is necessary in order to deter AMTI from future conduct of the kind engaged in here.

{¶ 127} AMTI's fifth assignment of error is overruled, as is ITC's second cross-assignment of error.

V

{¶ 128} AMTI's sixth assignment of error is as follows:

{¶ 129} "IF THE PUNITIVE DAMAGES AWARD IS NOT REMITTED, THEN THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING ITC $2,941,502.31 IN ATTORNEYS' FEES AND COSTS."

{¶ 130} In its final assignment, AMTI argues that the trial court abused its discretion when it awarded ITC's counsel $2,941,502.31 in attorneys' fees because the prior punitive damages award of $5,832,974.34 was sufficient to compensate ITC for its attorneys' fees and serve as a deterrent to any future tortious conduct.

{¶ 131} We review the trial court's decision to award attorney fees under an abuse of discretion standard. *Bittner v. Tri-County Toyota, Inc.* (1991), 58 Ohio St.3d 143, 146. "When awarding reasonable attorney fees pursuant to R.C. 1345.09(F)(2), the trial court should first calculate the number of hours reasonably expended on the case times an hourly fee, and then may modify that calculation by application of the factors listed in DR 2-106(B)." *Id.* at 145. Furthermore, "[i]t is well settled that where a court is empowered to award attorney fees by statute, the amount of such fees is within the sound discretion of the trial court. Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere." *Id.* at 146.

{¶ 132} In support of its argument, AMTI relies on *Toole v. Cooke* (May, 6, 1999), Franklin App. No. 98AP-486 (abrogated on other grounds), wherein the Tenth District Court of Appeals affirmed the trial court's decision refusing to award attorneys' fees notwithstanding the jury's verdict in favor of such an award.

Specifically, the court of appeals observed that the punitive damages award was $250,000.00 and constituted more than half of the plaintiff's total verdict amount. Id. Accordingly, the court held that the punitive damages would compensate the plaintiff for her attorneys' fees and have the appropriate deterrent effect on the defendants. Id.

{¶ 133} Contrary to AMTI's assertion, while the Ohio Supreme Court has stated that an award of punitive damages is grounds for an award of attorneys' fees, it did not state that it is a substitute for such an award. *Am. Chem. Soc. v. Leadscope*, 2010-Ohio-2725, at ¶ 86; citing *Galmish v. Cicchini,* 90 Ohio St.3d 22, 35, 2000-Ohio-7. In *Leadscope*, a recent case from the Tenth District, the court of appeals affirmed an award of $7,900,000.00 in attorneys' fees, despite the fact that $26,500,000.00 had already been awarded in compensatory and punitive damages. Id. at ¶ 10, 11.

{¶ 134} After a lengthy hearing on attorneys' fees and pre-judgment interest, the trial court found that ITC's counsel submitted $2,529,011.25 in attorneys' fees in connection with the time expended on the case after AMTI was named a defendant in the case on May 23, 2003. The trial court also found that ITC's counsel was entitled to $412,491.06 in costs associated with the litigation. Upon review, the trial court held that the fees and costs presented by ITC's counsel were reasonable in light of the duration and complexity of the litigation. The trial court noted that the case involved several complex legal issues "which required extensive discovery, analysis, and skilled attorneys to accomplish the same." Most importantly, the trial court held that AMTI failed to rebut the presumption that an

award of attorneys' fees was required to compensate ITC and deter AMTI. As previously noted, AMTI's conduct was particularly egregious, a fact of which the trial court was clearly cognizant. After a thorough review of the record, we conclude that the trial court did not abuse its discretion by awarding attorneys' fees in the instant case.

{¶ 135} AMTI's sixth assignment of error is overruled.

VI

{¶ 136} All of AMTI's and ITC's assignments and cross-assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

GRADY, P.J. and FAIN, J., concur.

Copies mailed to:

James A. Dyer
Michael P. Moloney
Heather Duffey Welbaum
Catharine D. Kidd
Brian S. Sullivan
David C. Greer
Hon. Mary L. Wiseman